De Saussure, Chancellor.
This case involves a question which is too frequently occurring before the Court. The decisions have been numerous, and almost every case has some peculiar or diversified circumstances, so that hardly any two of them are exactly alike.
The precise facts are stated in a few paragraphs. A widow lady, named Harriet Hart, being about to intermarry with Mr. John Reid, and being possessed of a good real and personal estate in her own right, a marriage contract or settlement was entered into between them, with the usual intervention of trustees, by which her property was conveyed to George Butler and David Rumph, in trust, that they would permit the said John and Harriet to receive and enjoy the profits and proceeds of the above mentioned property, (except three slaves, who are named) during the joint lives of the said John and Harriet: And if the said Harriet should survive the said John, in trust, that they (the said trustees) should assign, transfer, and pay over, all the said property, and the issue of the negroes, to the said Harriet, absolutely and unconditionally. But in case John Reid survived his wife, and there was no issue of the marriage, then the estate to go to said John Reid absolutely. If there should be issue surviving said Reid, then to such issue.
The marriage took effect — and Mr. John Reid died on the day of in the year 1828. There was no issue of the marriage ; so that Mrs. Reid is entitled to the whole estate, transferred to her unconditionally and absolutely.
During the coverture, Mr. John Reid was in possession of the estate, and received and applied the rents and profits as he pleased. He contracted debts with various persons ; among them, with James H. Boggs, one of the complainants, from whom he purchased certain mules, for which he gave his own note of hand, for two hundred and twenty-five dollars, on the 9th day of October, 1826, paya *455 ble on the 1st December following. This note has no reference to the trust estate ; but it is charged in the bill, and admitted in the answer, that these mules, for which the note was given, were purchased for the benefit of the plantation, and were placed thereon by John Reid, and have never been removed. John Reid also employed Mr. Oliver, another of the complainants, as an overseer on the plantation, for the year 1825, and gave him his note of hand on 1st January, 1826, for one hundred and sixty dollars, expressed to be for his services as overseer, during the year 1825.
It was conceded by the answer, that Oliver was so employed, and performed the service.
John Reid also contracted another account with Wallace & McFie, commencing in January 1825, and ending in March 1826. The charges were against John Reid in his own name, and without any reference to the trust estate. A draft was taken by Wallace & McFie from John Reid, on Conner <fe Wilson, for the then amount of the account, which was returned protested. This account, amounting to two hundred and fifteen dollars, seventy-three cents, (including some charges on protest and notice,) consisted of articles’ such as are commonly used and consumed in a respectable family, and for use on a cotton plantation, except about twenty dollars for spirits and wine, <fec. These are the claims now before the court, on which it is stated in the proceedings judgments have been obtained at law. But that they have not been, and cannot be satisfied, as John Reid died in the year 1828, insolvent, leaving no property of his own. It is further stated, that several executions having been returned núlla bona, John Reid had been arrested under a ca. sa. and that he had sworn out of goal, and assigned all his property, and his interest in his wife’s property, to Mr. Russell P. McCord, for the benefit of his creditors; and that he received the rents and profits of the trust estate for two years, and applied them as he thought right; but these complainants have not received payment from him or any other source. The complainants, therefore, seek payment of the trust estate.
*456 In the argument of this cause, the counsel for the complainants contended that the doctrine of marriage settlements, and trusts for the benefit of families, is mischievous to creditors and to the community, and dangerous to the peace of families ; and that it ought to be discouraged, and the estates made liable, as far as possible. The court has little to do with the policy of the laws. Its duty is to administer them as it finds them established. The doctrine and the practice of marriage settlements, have been in use in this country from its first settlement, and it is not for the court to discourage them. It is for. the legislature to decide on the policy ; and that has been done by statutes prescribing that marriage settlements shall be recorded within limited periods, in order to give them validity; and when so recorded, are good and effectual, according to their respective provisions. These Acts have given them a perfectly legal sanction, in addition to the force and effect which they had from the long established use of them pri- or to the recording statutes. Nor is the policy so questionable, as it is supposed to be. The protection of families, and care of their comfortable subsistance and proper education, is as much a measure of sound policy, as the payment of creditors. In most civilized countries, the estate of the wife is more fully protected by the general law, than they are in England or in America by special contracts and marriage settlements. And there is no injustice in it. Surely the woman about to marry, and to rear a family, useful to the community, has'a just right to say, I have property which I wish protected for the benefit of that family. She owes no debts, (for if she does they must first be paid) and in conveying her own property to trustees, for the benefit of herself and children, she does no more than exercise a right of control over her property, common to all proprietors ; nor have . creditors of her husband a right to complain ; for unless she married him, they could not have the shadow of claim on her property. And if she marries on condition that her property shall be protected, her husband’s creditors have no reason to complain, provided they are put on their guard, and are not led to give credit to the husband on false grounds. This is guarded *457 against by our statutes, which require marriage settlements to be recorded within limited short periods.
The first question, then, in this cause, is, was the settlement in question recorded within the time limited by law, which is three months 1 The copy of the settlement furnished me, bears date the 13th November, 1821. It was marked on the back, “ proven 30th January, 1822.” But the certificate of the proper officer, that the copy is a true copy from the records, does not say when it was recorded. This was a serious dilemma in the way; for the entry of “ proven, January, 1822,” on the copy settlement, does not establish that the original deed was then deposited to be recorded, or was actually recorded. The probate is often made before magistrates out of the office — and the deposit or the recording, may not occur till long after— sometimes never'. ' In the absence of the regular proof, I caused the book of records to be searched, and the search has resulted in the disclosure of the most extraordinary carelessness in the office at the time in question ; for it appears that from the 16th November, 1821, to the 22d January, 1822, the time of recording a great number of deeds, comprised in thirty pages, has not been mentioned. Before and after these periods, the time is mentioned when every deed is recorded ; and as the marriage settlement we are considering is recorded in the intermediate space of time between those two dates, it appears to have been recorded within the three months prescribed by law, and is valid and effectual to its purposes.
The next question is, whether the complainants are entitled to relief under the provisions of the deed. We have seen that the trustees were bound to permit John Reid and Harriet, his wife, to receive and enjoy the profits and proceeds of the above mentioned property, (except three slaves,) during their joint lives ; and if Harriet Reid survived her husband, then the trustees were to assign, transfer and pay over to her, all the property and the issue of the slaves, absolutely and unconditionally. The deed, then, placed the income, only, of the estate, at the disposal of the husband and wife, during the coverture. Of this provision, all persons were apprized, in the manner prescribed *458 by law, by the recording; so that they might deal with the parties accordingly, if they chose to deal at all. So far as we have gone, then, it is obvious, that the court could not subject the body of the trust estate, to the claims of the creditors.
But another question is made, which must now be considered. It is argued for the complainants, that the several articles furnished, were for the benefit of the trust estate, which ought, therefore, to be subject to the payment. And it is urged that the court has already decided in several cases, that the trust estate should be subjected. This is certainly true. In the case of Cater vs. Eveleigh, the court decreed the estate to be liable for a saw gin, procured by the husband, father of the family, for the trust estate. In another case, respecting the trust estate of Eveleigh, 1 McCord’s Chan. Rep. 267, again the court subjected the estate for supplies of corn, furnished for the subsistence of the slaves. And • in other cases, trust estates have been subjected to the payment' of the wages of overseers employed to manage those estates. In all these cases, the court has gone on the principle that these were essential to the well being of the trust estate. The slave might perish if not supplied with corn or clothing ; the cotton might lay useless without the machinery to prepare it for market; and this is strong ground on which to place the subject. Yet it is dangerous — for it is difficult to assign the precise limits to this responsibility. It may be abused, to the destruction of. the body and substance of the estate itself, by the extravagance or mismanagement of the husband. I acknowledge that I feel great difficulty on the subject, and should be much gratified and relieved, if, on an appeal in this case, some general rules could be laid down for my government in such cases. One thing, however, is clear, that if the husband is allowed to expend all the income on other objects, and to leave such demands as are founded on real supplies, for the manifest benefit and reasonable improvement of the trust estate, entirely unpaid until his death, and then these creditors are allowed to come for payment on the body of the estate itself, all the purposes of protection *459 intended to be given to such estates, would be defeated. I see no remedy against this evil, but to examine strictly into the nature of the supplies to the estate, to ascertain whether they were indispensable to the estate itself, and not merely for the usufructuaries personally. And also to require that even such creditors should use all proper diligence to obtain payment out of the income of the estate, from year to year, as such indispensable supplies were furnished.
To apply these views to the present. There is no doubt that the mules supplied to the trust estate were a durable benefit, perhaps- as much so as a saw gin ; for they last as long, and are extensively useful. It seems the mules were sold by Mr. Boggs to Mr. Reid, in the autumn of 1826, and he gave his note on 9th October, 1826, for two hundred and twenty-five dollars, payable on the first day of December following. 'The mules were placed on the plantation of the trust, and worked on it, and now remain thereon, and the present cestui que use, or rather absolute owner, has the benefit of them. I think, this case comes clearly within the principles of the decided cases; and the mules must be paid for, especially as the creditor seems to have pursued his remedy with proper diligence, and endeavored to get payment, without success. It was ingeniously argued, that this would be giving a lien on the mules, which the parties did not contract for; It struck me at first with some force; but on reflection, I am satisfied it has not the weight ascribed to it. The question is, not whether Mr. Boggs has a lien on the mules, for that he certainly has not — but it is, whether the creditor, having supplied the trust estate with an article essential to its improvement, and which still remains beneficial to the present owner, is not entitled to be paid out of the trust estate, on the same footing with other creditors, standing on the same ground.
The next claim was that of the overseer, for wages for superintending the estate. This kind of claim has been repeatedly sustained by the court; and 'as there has been no laches, but reasonable diligence used without success to obtain payment, during the life of Mr. Reid, it appears *460 to ine to be just, that the overseer should be paid by the present possessor of the estate, who was entitled to the income jointly with her husband, during the coverture.
The next claim is that of Wallace & McFie, for the payment of an account for articles furnished to Mr. Reid, in the year 1825, and part of 1826. On examining that account, it appears that nearly three-fourths of the amount are for cotton bagging, negro cloth, <fec. for the indispen-sible use of the estate. These appear to me to come within the principles which have been recognized by the court in its decisions heretofore made, on this anomalous and embarrassing subject. The remaining articles for general family consumption, do not come within the principles, and cannot be allowed.
It was properly argued for the defendant, that before she could be called upon for payment, she was entitled to have the crops of the time that the estate was held by an as-signee, applied to the payment of the claims now made on her, unless otherwise legally applied. It will therefore be necessary to order a reference, that the commissioner may enquire and report, if there be any part of the proceeds of those crops remaining, properly applicable' to pay these demands. The assignee will doubtless produce the accounts of the receipts arid expenditures, without putting the parties to the expense and delay of making him a party. Should that fund be insufficient, then the deficiency must be made up by the defendant.
After a good deal of reflection, however, I am satisfied that the complainants have no right to touch the capital of the estate. The deed of settlement gave only the income of the estate to the husband and wife, during the cover-ture. That deed was recorded according to law, as a notice to all the world, of what interests the parties had in the estate. In giving credit, therefore, they could look only to the income ; and to the income they must resort for payment. Nor will the court permit the whole of the present income to be taken from the defendant. She must be allowed a reasónable proportion for her maintenance out of it, and the remainder applied to the payment of the demands of the complainants.
Preston, for the defendants.
It is conceded that a trust
estate is liable for debts created by it. Credit is indispensable to its existence. The wants of the estate must be supplied, and in the absence of any other mode this must be resorted to. But this concession must not be extended further than the terms import. The tenant of a term, cannot charge the estate in the hands of the remainderman, for expenses incurred in rendering it useful or convenient to himself. Reid was tenant for life, and these, all the proceedings show, are his own proper debts, and it never was thought that the trust estate, except so far as he had an interest in it, was to come in aid of his liability. That estate is passed away, and can they pursue it in the hands of the present owner 1
*461 On looking into the decisions in this State on this subject, I find that this arrangement which I propose to make, is not a new course. For in the case of Bethune and others vs. Beresford and wife and others, (1 Des. Rep. 174,) the court, after deciding that the income of the settled estate was liable, to a certain extent, to the claims of the creditors then suing, determined that the wife, from whom the estate was derived, should have a subsistence out of the income, and made a provision accordingly.
It is therefore ordered and decreed, that it be referred to the commissioner to examine and report the amount of the debts due to the respective complainants, according to the principles laid down in this decree. Also, that he further enquire and report, what was the amount of the income of the estate whilst it was in the hands of the as-signee of John Reid, and what application has been made thereof; and whether any, and what sum, remains applicable to the debts due the complainants.
And he is further directed, in case it be necessary to resort to the income of the estate in the hands of the defendant, to examine and report what is the average amount of that income, and- what proportion thereof would be a proper allowance for the support of the defendant, until the debts due the complainants should be paid out of the remaining part of the income.
From this decree both parties appealed. The complainants, on the ground that the estate should be made liable, and sold for the purpose of satisfying their claims. The defendants, on the ground that the estate became absolute in Mrs. Reid, upon the death of her husband, and was not liable for debts incurred for the benefit of the particular estate.
If she had sold or transferred it to another, could the creditors follow it 'l This is not a legal claim, it is founded in a supposed equity, which is raised when one has contributed to the improvement and preservation of the estate. If, then, we regard John Reid as the proper agent for the estate, yet these debts were contracted by the tenant for life, with a view to increase his own income. They are not, therefore, necessary to the remainderman. Tenant for life, without impeachment, is bound to keep the premises in repair. 2 Atk. 283, Partretch vs. Powley. Tenant for life is bound to keep down the interest and to share with the remainderman a part of the principal. 1 Atk. 467; 1 Ves. 234. Reid purchased mules and they are found on the premises. If Mrs. R. has intermeddled with them, she may be liable as executrix de son tort, and not by this bill. A fire engine or cider press erected by tenant for life, goes to his executor. Dudley vs. Ward, P. W. 113. As to what debts the tenant for life may charge the remainderman, 1 Brown, 206, Jones vs. Morgan.
Chappell, contra,
cited Cater vs. Eveleigh, 4 Des. R. 19; James vs. Mayrant, do. 591 ; Montgomery vs. Eve-leigh, 1 M’Cord’s Ch. R. 267.